PATRICIA RIVET MURRAY, Judge.
 

 Bln this criminal case, the defendant, Darryl Robinson, appeals his conviction and sentence for one count of armed robbery and one count of attempted armed robbery. His three assignments of error are misidentification, ineffective assistance of counsel, and excessiveness of sentence. For the reasons that follow, we affirm.
 

 STATEMENT OF THE CASE
 

 On August 7, 2009, the State filed a bill of information charging Mr. Robinson with two counts of armed robbery and two counts of attempted armed robbery. On that same date, Mr. Robinson pled not guilty. On January 15, 2010, the district court found probable cause and denied the motions to suppress the evidence and identification. The State proceeded to trial on counts two (attempted armed robbery) and four (armed robbery).
 
 [1]
 
 Following a two-day jury trial held on August 25-26, 2010, Mr. Robinson was found guilty as charged. On September 23, 2010, a multiple bill hearing was held. On the armed robbery count, Mr. Robinson was adjudicated a second felony offender, and he was sentenced on that|2count pursuant to La. R.S. 15:529.1 to serve 198 years at hard labor without benefits. On the attempt count, he was sentenced to serve forty-nine years and six months at hard labor without benefits pursuant to La. R.S. 14:27 and 14:64. The district court ordered the sentences to run consecutively rather than concurrently. Mr. Robinson’s motion to reconsider sentence was denied. This appeal followed.
 

 STATEMENT OF THE FACTS ■
 

 This case involves two separate offenses that occurred in the early morning hours of May 11, 2008, at two separate locations in New Orleans. The first offense, which occurred at about 3:45 a.m., was the armed robbery of Frank Charles of his vehicle and cell phone at a McDonalds’ drive thru window. The second offense, which occurred at about 3:50 a.m., was the attempted armed robbery of Alicia Mackie at a nearby Burger King where she was working.
 

 Armed robbery at McDonalds
 

 Mr. Charles, who owns a nightclub, testified that on the day of the offense he closed his nightclub at about 3:45 a.m. On his way home from work, he stopped for something to eat at the McDonalds on South Claiborne Avenue. Immediately after Mr. Charles pulled up to the drive-thru menu box and rolled down his window, an armed robber appeared out of nowhere. The robber pointed a gun at Mr. Charles’s head and demanded that he get out of his vehicle, a grey Nissan pickup truck. Mr. Charles complied and moved to the back of his truck. The robber jumped in the truck and fled. Because Mr. Charles’ cell phone was in his truck, a McDonalds’ employee called the police for him.
 

 |oMr. Charles described the robber as a black male dressed as a woman, wearing high heeled shoes, a flowered dress, and a wig. Based on his height of six feet, one inches tall, Mr. Charles estimated the robber’s height to be six feet tall. After returning to the scene, Mr. Charles realized that the robber might have been shorter because the robber was standing on a curb during the robbery. Mr. Charles chose Mr. Robinson’s picture from
 
 *93
 
 a six-person photographic line-up. Mr. Charles was certain of his identification. Mr. Charles indicated that he saw Mr. Robinson’s face when Mr. Robinson pointed the gun at him. He also saw Mr. Robinson’s face when he passed him getting out of the truck; at that point, he was within a foot of Mr. Robinson. At trial, Mr. Charles identified Mr. Robinson. He also identified the items of women’s clothing that were found by the police.
 

 Attempted armed robbery at Burger King
 

 Ms. Mackie was working the overnight shift at the Burger King on South Carroll-ton Avenue. She was working with two other employees: Lynette Stevenson and Juaquita Bradley, the manager. Ms. Mackie was working the drive thru window, and she was standing near the milkshake machine. From where she was standing, she could see when a vehicle pulled up to the drive thru menu box. At approximately 3:50 a.m., Ms. Mackie saw a vehicle pull up to the drive thru menu box. She asked whether she could take an order but received no reply. She then opened the window, and the robber appeared out of nowhere pointing a gun at her. When Ms. Mackie saw the gun, she ran to the back of the Burger King screaming. On her way, she grabbed Ms. Stevenson, who was mopping the floor. 1 .The two women ran into the office, and closed the door. By this time, the robber had entered the Burger King through the window and approached the office door. The robber stated: “Bitch, open the door before I blow it down.” When Ms. Stevenson opened the door, the robber grabbed Ms. Mackie and dragged her towards the front of the Burger King demanding money. Meanwhile, Ms. Stevenson escaped by running out the back door. Ms. Mackie screamed for the manager, but the manager did not immediately reply because she was in the bathroom.
 

 As the robber and Ms. Mackie reached the front of the Burger King, the manager came out of the bathroom. They were near the window, and the robber ordered Ms. Mackie to her knees. The robber had the gun pointed at the top of her head, and he stated: “Bitch, I should make you take off your clothes.” During this time, the manager removed the cash drawer from the register and placed it on top of the counter. The robber grabbed the money and demanded that Ms. Mackie give him a kiss, but she turned away. The robber demanded that the manager give him a kiss, and she complied. The robber then left through the window. Ms. Mackie saw the robber drive off in a grey Nissan truck.
 

 Ms. Mackie described the robber as wearing a red and black flowered dress, a red necklace, and a burgundy reddish wig with a black clamp. She subsequently identified Mr. Robinson as the robber from a six-person photographic line-up. Ms. Mackie further identified Mr. Robinson in court and testified that she was one hundred per cent positive that he was the person who robbed her. Ms. Mackie still | r,further identified the persons seen in the Burger King surveillance video taken during the robbery that was played for the jury.
 

 Joint investigation of robberies
 

 On the morning of the robberies at about 11:30 a.m., Officer Roach of the Ken-ner Police Department responded to a dispatch call of a possible vehicle theft in progress at 247 Clemson Street in Kenner. When he arrived on the scene, Officer Roach observed a grey pickup truck with one of the driver’s side windows broken. No one was around the truck. In the back seat of the truck, Officer Roach found a red female wig, a floral dress, a black bra, and red necklace. After running the li
 
 *94
 
 cense plate of the truck, he learned that it had been stolen from New Orleans that morning. Officer Roach then spoke to the woman who had called the police. Based upon information the woman provided, Officer Roach knocked on the door of 247 Clemson Street, apartment number two. Mr. Robinson answered the door and spoke with Officer Roach. Officer Roach then made contact by cell phone with the owner of the stolen truck, Mr. Charles. Mr. Charles informed Officer Roach of the armed robbery that morning. At trial, Officer Roach identified the items of women’s clothing he found in the truck; and he also identified Mr. Robinson.
 

 New Orleans Police Department (“N.O.P.D.”) Detectives Wayne DeLarge and Jerry Baldwin investigated the Mc-Donalds and Burger King robberies, respectively. Detective Baldwin testified that the Burger King and McDonalds at which the two robberies occurred were located less than five minutes apart. | fiBecause of the similarities between the two robberies — the robber wore the same disguise in both robberies, the closeness in time and location of the robberies, and the involvement of a grey Nissan truck in both robberies — the detectives believed the robberies were related. The detectives thus conducted a joint investigation. After meeting with the Kenner Police Department, the detectives developed Mr. Robinson as a suspect; and they interviewed him. Detective Baldwin testified that when they met with Mr. Robinson, he observed that Mr. Robinson, like the suspect on the Burger King surveillance video, had muscular arms; a medium brown complexion; was approximately five-feet, seven inches tall; and had no tattoos or markings on his arms or legs. Detective Baldwin thus testified that Mr. Robinson matched the suspect he observed on the Burger King surveillance video.
 

 Detective DeLarge compiled the six-person lineup shown to Mr. Charles on May 19, 2008. Detective DeLarge testified that Mr. Charles made a positive identification of Mr. Robinson. Detective DeLarge further testified that in making the positive identification Mr. Charles remarked: “the guy looks just like him.”
 

 Detective Baldwin compiled the six-person lineup shown to Ms. Mackie on May 20, 2008. Detective Baldwin testified that Ms. Mackie made a positive identification of Mr. Robinson. Detective Baldwin further testified that neither of the other two Burger King employees who were present during the robbery were able to identify the robber.
 

 After both victims (Mr. Charles and Ms. Mackie) made positive identifications of Mr. Robinson, the detectives obtained warrants for his arrest. 17They did not obtain a search warrant for Mr. Robinson’s residence (apartment) because they learned that he had been evicted.
 

 The parties made three stipulations during the trial:
 

 • Officer Lacrouts, a crime lab technician for the Kenner Police Department, collected the evidence from the vehicle (the Nissan truck) — the red bra, the black and red floral dress, the red wig, and the red necklace — and dusted the vehicle for fingerprints.
 

 • Mr. Robinson had no tattoos on his arms, chest, or thighs.
 

 • The fingerprint analysis done on fingerprints lifted from the vehicle (the Nissan truck) and the palm print lifted from the Burger King drive thru window turned up negative results.
 

 Ashley McFarland testified for the defense and provided an alibi for Mr. Robinson. She testified that she formerly lived with Mr. Robinson in the apartment on Clemson Street in Kenner and that they
 
 *95
 
 had a child together. She further testified that they were living together in that apartment on the date of the robberies. According to Ms. McFarland, on the night of the robberies, Mr. Robinson was at home with her. In the early morning hours, he was outside of the apartment. She went outside to look for him, but she could not find him. About fifteen minutes later, he came inside the apartment wearing jeans and a shirt. Ms. McFarland testified that she did not recognize any of the women’s clothing worn by the robber during the robberies.
 

 DISCUSSION
 

 Errors Patent
 

 A review of the record for errors patent reveals none.
 

 IsAssignment of Error 1: Misidentifi-cation
 

 By his first assignment of error, Mr. Robinson contends that the evidence is insufficient to support his convictions because the State failed to negate any reasonable probability of misidentification. In reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 
 See State v. Brown,
 
 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18. Under the
 
 Jackson
 
 standard, the appellate court “ ‘must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.’ ”
 
 State v. Neal,
 
 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657 (quoting
 
 State v, Captville,
 
 448 So.2d 676, 678 (La.1984)). The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La.1984).
 

 In this case, Mr. Robinson was convicted of armed robbery and attempted armed robbery, violations of La. R.S. 14:27 and 14:64. “The elements of armed robbery are: (1) the taking, (2) of anything of value, (3) from a person or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon.”
 
 State v. Carter,
 
 99-2234, p. 31 (La.App. 4 Cir. 1/24/01), 779 So.2d 125,
 
 144(citing State v. Banks,
 
 96-652, 96-653, p. 12 (La.App. 4 Cir. 1/15/97), 694 So.2d 401, 410). The thrust of Mr. Robinson’s |flcontention on appeal is not that the elements of the offenses were not satisfied but rather that the State failed to negate the reasonable probability of mis-identification. He contends that the lack of physical evidence to link him to the crimes should have created a reasonable doubt that he was the person who committed the offenses. He emphasizes that none of the fingerprints found on the truck and the Burger King drive thru window matched his fingerprints. He further emphasizes that the weapon was never found. He still further emphasizes that Mr. Charles’ initial description of him was inaccurate; Mr. Charles initially described Mr. Robinson as being six feet tall, yet he is only five-feet, six inches or five-feet, seven inches tall.
 

 When, as in this case, the defendant disputes identity, the State must negate any possibility of misidentification. The standard for determining the reliability of an identification, or the substantial likelihood of misidentification, is the five-factor test enunciated in
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of his or her
 
 *96
 
 prior description of the perpetrator; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and the confrontation.
 
 State v. Jones,
 
 02-1171, p. 14 (La.App. 4 Cir. 6/26/02), 822 So.2d 205, 213 (citing
 
 Manson, supra).
 
 The focus of the Manson factors is on the victim’s visual identification of the perpetrator.
 
 See State v. Summers,
 
 10-0341, pp. 8-9 (La.App. 4 Cir. 12/1/10), 52 So.3d 951, 956-57.
 

 | inApplying the
 
 Manson
 
 factors to the facts in this case, we find the record supports the reliability of the identifications. Although Mr. Robinson wore a disguise, there is no indication that his face was covered during either robbery. Both victims had ample opportunity to view Mr. Robinson’s face during the respective robberies. Mr. Charles testified that he looked Mr. Robinson in the face when he was first accosted by him as well as when he passed by him on the way to the rear of his truck. Contrary to Mr. Robinson’s argument, Mr. Charles testified that the area was sufficiently lighted. Although Mr. Charles originally approximated Mr. Robinson’s height at six feet tall, he later realized that Mr. Robinson was shorter because he was standing on a curb during the robbery. Ms. Mackie likewise had ample opportunity to view Mr. Robinson’s face throughout her ordeal, despite that she was hysterical as Mr. Robinson argues. Indeed, Mr. Robinson even attempted to kiss her.
 

 Aside from the discrepancy in Mr. Charles’s initial description regarding the robber’s height, both victims’ descriptions of the robber were similar: five-feet, six to five-feet, eight inches tall; 165 to 180 pounds; brown skin; and muscular to medium build. Both victims positively identified Mr. Robinson from a six-person lineup only a few days after the robbery — Mr. Charles did so eight days later, Ms. Mack-ie did so nine days later. Contrary to Mr. Robinson’s suggestion, the lapse of time between the robberies and the victims’ identifications was not so long as to make the victims’ identification unreliable.
 
 See State v. Sterling,
 
 96-1390, p. 5 (La.App. 4 Cir. 11/13/96), 684 So.2d 74, 78 (holding a three-month lapse between the lacrime and the photographic line-up is not so long as to make the identification unreliable);
 
 see also State v. Jones,
 
 10-1026, p. 2 (La.10/1/10), 48 So.3d 210, 211 (“Nor do we find the two month delay between the lineups an unreasonable length of time that would increase the likelihood of mis-identification.”). At trial, both victims testified that they were certain of their identifications. Both victims also identified the items of women’s clothing that Mr. Robinson wore during the robberies. As noted, the items of women’s clothing were found in Mr. Charles’ stolen grey Nissan truck that was found parked in front of Mr. Robinson’s apartment.
 

 Further corroboration of Mr. Robinson’s identification as the person who committed the robberies was provided by Detective Baldwin’s testimony that Mr. Robinson’s physical characteristics matched those of the robber pictured in the Burger King surveillance video. Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the State’s witnesses were credible and that Mr. Robinson was guilty of both crimes. This assignment of error is without merit.
 

 Assignment of Error 2: Ineffective Assistance of Counsel
 

 Mr. Robinson’s second assignment of error is that his trial counsel was ineffective. Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief filed initially in the district court where a full evidentiary hearing can be
 
 *97
 
 held.
 
 State v. Prudholm,
 
 446 So.2d 729 (La.1984);
 
 State v. Johnson,
 
 557 So.2d 1030 (La.App. |124th Cir.1990);
 
 State v. Sparrow,
 
 612 So.2d 191 (La.App. 4th Cir. 1992);
 
 State v. Petta,
 
 496 So.2d 390 (La.App. 4th Cir.1986). However, in the interest of judicial economy, an appellate court can consider an ineffective assistance claim if the record on appeal contains sufficient evidence to evaluate the merits of the claim.
 
 State v. Seiss,
 
 428 So.2d 444 (La.1983);
 
 State v. Haywood,
 
 516 So.2d 196 (La.App. 4th Cir.1987);
 
 State v. Kelly,
 
 92-2446 (La.App. 4 Cir. 7/8/94), 639 So.2d 888. Such is the case here.
 

 To succeed on an ineffective assistance of counsel claim, a defendant must establish two criteria: (i) that his trial counsel’s performance was deficient and (ii) that the deficiency prejudiced him.
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
 
 State v. Fuller,
 
 454 So.2d 119 (La.1984). A claim of ineffective assistance may be disposed of based upon a finding that either one of the two
 
 Strickland
 
 criteria have not been established.
 
 State v. James,
 
 555 So.2d 519, 524 (La.App. 4th Cir.1989);
 
 State v. Frazier,
 
 599 So.2d 419, 421 (La.App. 4th Cir.1992).
 

 Mr. Robinson’s ineffective assistance claim is premised on his trial counsel’s failure to object at his multiple bill hearing to the State’s failure to prove the discharge date of his prior conviction. As a result of his counsel’s failure to object, he is barred from raising on appeal the State’s failure to prove that his prior conviction fell within the ten-year “cleansing period” of La. R.S. 15:529.1(C).
 
 [2]
 

 This Section shall not be applicable in cases where more than ten years have elapsed since the expiration of the maximum sentence or sentences of the previous conviction or convictions, or adjudication or adjudications of delinquency, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any of said ten-year periods.
 

 11sThe State generally has the burden of proving that the ten year cleansing period under La. R.S. 15:529.1 has not elapsed. In order to satisfy its burden, the State generally must prove the defendant’s discharge date because “[t]he expiration of the previous sentence is determined by the date of the actual discharge from supervision by the Department of Corrections.”
 
 State v. Martello,
 
 98-2066, p. 14 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1201-02 (citing
 
 State v. Lorio,
 
 94-2591, p. 4 (La.App. 4 Cir. 9/28/95), 662 So.2d 128, 130).
 
 [3]
 

 In this case, the State alleged in the multiple bill of information that on December 6, 1999, Mr. Robinson pled guilty to possession with intent to distribute marijuana in case number 98-1640 in Jefferson Parish. The bill of information filed in case number 98-1640 reflects that the crime was committed on March 4, 1998, and the guilty plea waiver of rights form and minute entry from December 6, 1999, reflect that Mr. Robinson was sentenced to serve ten years at hard labor with credit for time served. The minute entry further reflects that Mr. Robinson was in prison at the time he entered his guilty plea and that he was remanded to prison after being sentenced. The transcript from the multiple bill hearing reflects that defense counsel asked whether the State’s exhibit contained any information as to when Mr.
 
 *98
 
 Robinson was released from State supervision on the prior conviction, and the officer responded in the negative. Defense counsel neither lodged an objection nor filed a written response to the multiple bill. Thus, the issue was not | preserved for appellate review.
 
 State v. Boles,
 
 99-0427, p. 7 (La.App. 4 Cir. 5/10/00), 763 So.2d 74, 79.
 

 Mr. Robinson contends that he is prejudiced by his counsel’s failure to preserve the issue for review. The prejudice, he contends, is that if the issue had been preserved the State’s failure to meet its burden under La. R.S. 15:529.1(0 would have entitled him to a reversal of his multiple offender adjudication. He points out that the State’s failure to submit proof of his discharge date renders it impossible to calculate with certainty whether the cleansing period elapsed. He contends that “[i]f he were incarcerated continuously since March 4, 1998, [the date of the prior marijuana offense and apparently the date of his arrest for that offense] and had received credit for that entire time, the cleansing period would have elapsed on March 4, 2008, two months before the current offense was committed.”
 

 Contrary to Mr. Robinson’s contention, any period of incarceration is not counted in computing the ten-year cleansing period; La. R.S. 15:529.1(0 provides that “any period of servitude by a person in a penal institution, within or without the State, shall not be included in the computation of any of said ten-year periods between the expiration of the maximum sentence or sentences and the next succeeding offense or offenses.” As noted above, the minute entry reflects that Mr. Robinson was in prison at the time he entered his guilty plea and that he was remanded to prison after being sentenced on December 6, 1999. Less than ten years elapsed between the date he pled guilty and was sentenced and remanded to Imprison (December 6, 1999) and the instant armed robbery offense (May 11, 2008). The record supports a finding that the ten year cleansing period had not elapsed. Mr. Robinson thus cannot show prejudice as a result of his trial counsel’s failure to properly preserve the issue for appellate review. This assignment of error is without merit.
 

 Assignment of Error 3: Excessiveness of Sentence
 

 By his final assignment of error, Mr. Robinson asserts that the maximum sentences the district court imposed on him on both counts are excessive. He also asserts that the trial court should not have ordered his sentences be served consecutively rather than concurrently. We separately address each of these contentions.
 

 Consecutive sentences
 

 The law concerning consecutive sentences is set forth in La. C.Cr.P. art. 883, which provides:
 

 If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
 

 A district court has discretion to order that sentences run consecutively rather than concurrently.
 
 State v. McCray,
 
 28,531, p. 3 (La.App. 2 Cir. 8/21/96), 679 So.2d 543, 545. When “the convictions stem from separate incidents involving Indifferent victims and occur over a lengthy period of time, the resulting consecutive penalties will not be found to be an abuse of that discretion.”
 
 Id.
 

 In this case, the district court expressly found that the incidents were sep
 
 *99
 
 arate, distinct, individual crimes and that the crimes were not a part of a pattern of one ongoing criminal act. The crimes affected different victims at different locations; hence, no basis for imposing concurrent sentences existed. Both victims testified that they were traumatized by the events. Mr. Robinson pointed the handgun at the victims’ heads throughout the robberies, and he made sexual threats to Ms. Mackie. Mr. Robinson also threatened the lives of more than one person during the Burger King robbery. In light of these factors, we find no abuse of discretion in the district court’s order that the sentences be served consecutively.
 

 Excessive Sentences
 

 Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979). Article 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive, or unusual punishment.” A sentence, although within the statutory limits, is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless and needless imposition of pain and suffering.”
 
 State v. Caston,
 
 477 So.2d 868, 871 (La.App. 4th Cir.1985);
 
 State v. Bonanno,
 
 384 So.2d 355, 357 (La.1980).
 

 117An appellate court reviewing an excessive sentence claim must determine whether the trial court adequately complied with the statutory sentencing guidelines set forth in La.C.Cr.P. art. 894.1, as well as whether the particular circumstances of the case warrant the sentence imposed.
 
 State v. Trepagnier,
 
 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189-90;
 
 State v. Black,
 
 98-0457, p. 7 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 891. If the appellate court finds the district court adequately complied with Article 894.1, it then must determine whether the sentence imposed is too severe in light of the particular defendant and the particular circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.”
 
 State v. Landry,
 
 03-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239;
 
 see also State v. Bonicard,
 
 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185;
 
 State v. Quebedeaux,
 
 424 So.2d 1009, 1014 (La.1982). However, a trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion.
 
 State v. Cann,
 
 471 So.2d 701, 703 (La.1985).
 

 On appellate review of an excessive sentence claim, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.
 
 State v. Walker,
 
 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462. The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
 

 |1sAs noted, Mr. Robinson challenges as excessive the maximum sentences the district court imposed on him on both counts: 198 years without benefits as an habitual (double) offender on the armed robbery conviction under La. R.S. 15:529.1(A)(l)(a); and forty-nine and a half years without benefits under La. R.S. 14:27 and 14:64. Mr. Robinson urges that the district court failed to take into consideration that no shots were fired, that no one was seriously injured, and that no evidence was presented that he was ever convicted of a violent crime before these robberies. Although Mr. Robinson urges that he is not the most heinous of offenders, the sentences the district court imposed on him are supported by the record and the jurisprudence.
 

 
 *100
 
 At sentencing the district court reviewed the facts of the case that were established at the trial. The district court then found that under the sentencing guidelines of La.C.Cr.P. art. 894.1 there was an undue risk that during any period of suspended sentence or probation Mr. Robinson would commit another crime. The district court advised Mr. Robinson that he was in need of correctional treatment in a custodial environment and that a lesser sentence would depreciate the seriousness of his crimes.
 

 At sentencing the district court also considered the aggravating circumstances listed in La.C.Cr.P. art. 894.1(B). The district court found that there were several aggravating circumstances present in the instant cases, including the following:
 

 • Mr. Robinson in committing the robberies manifested deliberate cruelty to the victims and made threats to the victims;
 

 | is* He used a dangerous weapon and foreseeably created the risk of death or great bodily harm to more than one person during the robberies;
 

 • His actions caused significant psychological injury to Ms. Mackie and significant economic loss to Mr. Charles;
 

 • Mr. Robinson’s conduct was unjustified;
 

 • He showed no remorse;
 

 • The State’s evidence was overwhelming;
 

 • The offenses were crimes of violence; and
 

 • Mr. Robinson had a criminal history.
 

 Mr. Robinson failed to offer any mitigating circumstances at the sentencing hearing. Thus, a sentence of imprisonment was warranted by the circumstances of this case.
 

 The jurisprudence is replete with cases in which appellate courts have affirmed the imposition of the maximum sentence of 198 years on a habitual offender for armed robbery.
 
 See State v. Doleman,
 
 02-0957 (La.App. 4 Cir. 12/4/02), 835 So.2d 850;
 
 State v. Hawthorne,
 
 00-1258 (La.App. 4 Cir. 11/8/00), 772 So.2d 924;
 
 State v. Freeman,
 
 00-0238, p. 14 (La.App. 3 Cir. 10/11/00), 770 So.2d 482, 491 (collecting cases). The jurisprudence also supports the imposition of the maximum sentence of forty-nine and a half years on the attempted armed robbery count.
 
 See State v. Stanton,
 
 05-0812 (La.App. 4 Cir. 3/8/06), 929 So.2d 137 (affirming the imposition of a forty-five year sentence on a defendant who was convicted of attempted armed robbery);
 
 see also State v. Augustine,
 
 482 So.2d 150 (La.App. 4th Cir.1986)(affirming imposition of a forty-nine and a half year sentence on a defendant convicted of attempted armed robbery). It cannot be said 12nthat the sentences imposed on Mr. Robinson make no measurable contribution to acceptable goals of punishment, are nothing more than the purposeless imposition of pain and suffering, or are grossly out of proportion to the severity of the crimes. Thus, the sentences imposed on Mr. Robinson are not unconstitutionally excessive.
 

 Considering the record, the extensive reasons given by the district court for the sentences imposed, and the jurisprudence, we find the sentences imposed on Mr. Robinson are not excessive. This assignment of error is without merit.
 

 DECREE
 

 For the forgoing reasons, the defendant’s convictions and sentences are affirmed.
 

 AFFIRMED
 

 [1]
 

 . After the trial in this case, on October 28, 2010, the State
 
 nolle prosequied
 
 the remaining two counts.
 

 [2]
 

 . La. R.S. 15:529.1(0 provides:
 

 [3]
 

 . An exception is recognized when less than ten years have elapsed between convictions.
 
 State v. Tucker,
 
 95-0030, p. 11 (La.App. 4 Cir. 9/18/96), 682 So.2d 261, 266. The exception is not applicable here.