TERRI F. LOVE, Judge.
| iThis appeal arises from Darbin Mauricio Santos-Castro’s conviction of two counts of armed robbery with a firearm. Upon review, we find no errors patent. We find that sufficient evidence existed for the jury to positively identify Mr. Santos-Castro as the perpetrator and that sufficient evidence exists in the record to establish that the elements of armed robbery were proven. Mr. Santos-Castro’s non-unanimous verdicts were constitutional and the sentences imposed were not excessive because the sentences comply with Louisiana statutory law and jurisprudence. Therefore, we affirm Mr. Santos-Castro’s convictions and sentences.

PROCEDURAL HISTORY

Darbin Mauricio Santos-Castro was charged by bill of information with two counts of armed robbery with a firearm, violations of La. R.S. 14:64 and 14:64.3. Mr. Santos-Castro pled not guilty. The trial court denied Mr. Santos-Castro’s mo *936 tion to suppress the identification. Mr. Santos-Castro then pled guilty as charged. However, Mr. Santos-Castro filed a motion to withdraw his former guilty plea and a motion for new trial, both of which were granted by the trial court.
Mr. Santos-Castro was tried by a twelve-person jury and found guilty as charged on both counts. The trial court denied Mr. Santos-Castro’s motion for new 12trial and sentenced him to forty-five years at hard labor on each count, with an additional five years at hard labor on each count pursuant to La. R.S. 14:64.3 for using a firearm in the commission of each armed robbery, both sentences without the benefit of parole, probation, or suspension of sentence, and with all sentences to run concurrently.
Mr. Santos-Castro filed a motion to reconsider sentence on the day of sentencing, which the trial court denied. Mr. Santos-Castro’s appeal followed.

TESTIMONY

Baker Jaber and his daughter Amani Jaber, were robbed in their place of business, the Gold Star Diner (“Diner”) in St. Bernard Parish. The following presents a summation of the testimony presented to the jury.

Testimony of Amani Jaber

Miss Jaber stated that on a Saturday in July 2009, she and her father were preparing to open the Diner when a person she referred to as “Rodriguez” entered. Miss Jaber described “Rodriguez” as having really long brownish-black hair and wearing an orange hat bearing the name of a sports team. She sold him coffee and a honeybun. “Rodriguez” sat at a side table talking in Spanish on a cell phone. He asked if the Diner cashed checks, and when Miss Jaber replied affirmatively, he allegedly told her that a friend wanted to cash a check. “Rodriguez” continued to talk in Spanish on his cell phone.
Miss Jaber accepted an order over the telephone and walked to the back to inform her father. Mr. Santos-Castro then entered the Diner followed by two other males, allegedly walking in “like a gang.” Mr. Santos-Castro was wearing a hat, blue jeans, and a baggy t-shirt. Mr. Santos-Castro was heavyset at the time of the incident, but in identifying Mr. Santos-Castro in court, Miss Jaber acknowledged |athat he was no longer heavyset. Miss Jaber stated that she would never forget someone who tried to kill her and her father.
Miss Jaber looked at Mr. Santos-Castro for a few minutes, as he was asking the co-perpetrators in English what they wanted and ordering the hamburgers. Miss Jaber asked if they wanted the hamburgers dressed. She then handed the order ticket to her father, and Mr. Santos-Castro said he wanted to cash a check. Mr. Jaber shouted that he would come into the dining area in a minute. When Mr. Jaber entered, Mr. Santos-Castro put a gun to his head and stated, in English, “Armed robbery. This is an armed robbery. Don’t move.” Another perpetrator jumped over the counter and grabbed Miss Jaber, but she kicked at him to deter him from following her and rant to the back of the Diner. The perpetrators then grabbed her and tied her up. Guns were placed to her head and the perpetrators attempted to take her out the back door, but she screamed and kicked.
Richard Angelico, an FBI agent, and two females then entered the Diner. One of the perpetrators alerted the others that someone came in, and they tossed Miss Jaber into a storage room. Miss Jaber then used her cell phone to telephone her mother, who called 911.
*937 Miss Jaber was absolutely, positively certain that she identified the correct person because she would never forget someone who put a gun to her father’s head. Miss Jaber identified photographs taken from the surveillance video and confirmed that she saw Mr. Santos-Castro in the photo. The surveillance video was played for the jury.
Miss Jaber identified a photograph of Selvin Rodriguez[1] on cross-jexamination4 and stated that he was the first perpetrator to enter the Diner and was alone. The person she identified in the photo as Mr. Rodriguez was wearing an orange Texas Longhorns hat.

Testimony of Baker Jaber

Mr. Jaber owned the Diner in July 2009, along with his wife and daughter, Miss Jaber, and the money in the cash register belonged to all of them. On the Saturday morning at issue, Mr. Jaber was in the kitchen and heard the alarm buzzer. Mr. Jaber saw a male standing by his daughter and watched her open the cash register. Miss Jaber subsequently asked her father to cash a check. The telephone rang, Miss Jaber took an order, and then handed the order ticket to Mr. Jaber. Miss Jaber called Mr. Jaber to the dining area because the perpetrators were waiting to allegedly cash a check. Mr. Jaber then walked up, turned, and Mr. Santos-Castro put a gun to his head. Another perpetrator jumped on him. Mr. Santos-Castro and the other perpetrator forced Mr. Ja-ber onto the floor and tied him up with plastic wrap or plastic ties. Mr. Jaber saw his daughter running to the kitchen. Two male perpetrators followed her and caught her. Mr. Jaber pleaded -with them not to harm to his daughter. One of the perpetrators stated, “[t]the money, the money.” Mr. Jaber gave the perpetrator his wallet, but the perpetrator indicated that he wanted the money from the restaurant. Mr. Jaber then went into the office and told the perpetrators where to find the money.
Mr. Jaber dreamt of Mr. Santos-Castro, indicating that he could not have forgotten Mr. Santos-Castro. Mr. Santos-Castro called him a motherf-— and ordered him to open the safe. When Mr. Jaber experienced difficulty opening the safe, Mr. Santos-Castro pushed the gun into his mouth and cursed at him again. | fiMr. Jaber was standing at the door to the office and was told not to move. The perpetrators then started taking money from the safe and placed it in a plastic bag from Walmart. The money belonged to Mr. Jaber and his daughter.
Mr. Santos-Castro learned that John Fleming was in the Diner. Mr. Santos-Castro forced Mr. Fleming onto the ground. The perpetrators then came back to Mr. Jaber, started breaking the telephone lines, and asked Mr. Jaber about a gun. Mr. Jaber saw Mr. Fleming escape. The perpetrators left the Diner. Mr. Ja-ber called 911 to report the robbery, and then walked into the dining area to find Mr. Fleming and Mr. and Mrs. Decker Landry. Mr. Jaber did not see his daughter and went back inside where he found her tied up in the storage room. He freed her with a knife and hugged her. Mr. *938 Jaber then saw that the perpetrators left the bag of money behind. Mr. Jaber identified a photograph from his video surveillance camera, depicting Mr. Santos-Castro and another perpetrator wearing a camouflage hat.
Mr. Jaber stated that: “That’s the man who destroyed my life.” Mr. Jaber confirmed that Mr. Santos-Castro was the man in the video and in the photographs. Mr. Jaber got a good look at Mr. Santos-Castro. He confirmed that Mr. Santos-Castro had put a gun to his head and in his mouth, stating further: “And in my ear. The worst ten minutes of my life.” The Diner had no customers after the robbery. He believed that his customers were afraid to come to the Diner. Mr. Jaber also stopped cashing checks. Mr. Jaber closed his business and Mr. Jaber concluded that Mr. Santos-Castro destroyed their lives.
Mr. Jaber described the gunman to the police as someone that was the same height as he or a little shorter. A month after the incident, Mr. Jaber met with St. Bernard Parish Sheriffs Office Detective Richard Mendel and stated, regarding a | (¡photo lineup: “[I]t’s this one, the one most one I think he is. Because there’s— there’s different pictures in there, and some of them look close. I said this is the closest I can say.” Mr. Jaber informed Detective Mendel that Mr. Santos-Castro was the person who put the gun to his head and that the other perpetrator also put a gun on him. When asked why Detective Mendel would come into court and state more than once that Mr. Jaber could not identify Mr. Santos-Castro, Mr. Jaber replied: “I seen [sic] it over and over. It’s him. It’s him. The guy is him.” Mr. Jaber could not remember if he signed the lineup sheet that Detective Mendel presented to him.

Testimony of John Fleming

Mr. Fleming, a retired FBI agent with twenty-seven years of service, went to the Diner for lunch shortly after 11:00 a.m. with the Landrys and Richard Angelico. The four entered the dining room and sat down, but no one greeted them. Mr. Fleming went toward the kitchen to find someone. He heard a commotion as he passed by the office, but thought it was a television. Mr. Fleming returned to the table before going back and knocking on the office door. Two male perpetrators burst out of the office. One was armed with a semi-automatic pistol, which he placed in Mr. Fleming’s face, ordering Mr. Fleming onto the floor. The gunman’s partner tied his hands together in the front with a half-inch tie wrap and told him in English to get on the floor, which he did. Mr. Fleming got a good look at the person who held the gun to his head. Mr. Fleming identified Mr. Santos-Castro in court as that person, and he estimated that Mr. Santos-Castro’s face had been eighteen inches away from his own. Mr. Fleming had “[n]o doubt in” his “mind” that Mr. Santos-Castro was the person who put the gun to his head.
17Mr. Santos-Castro and another perpetrator continued threatening Mr. Jaber. Mr. Fleming heard the perpetrators demanding the surveillance tape, unaware that the system did not record on a tape. Mr. Fleming felt that his life was in danger lying on the floor. He ran for the dining room, yelling for Mr. Angelico. Mr. Santos-Castro and another perpetrator chased Mr. Fleming, with one partner jumping onto Mr. Fleming’s back and tackling him to the floor. The perpetrators exited the office with a plastic bag of money when he knocked on the office door, but they placed the bag on top of an ice bucket. When Mr. Fleming ran, the perpetrators ran after him and then out *939 the front door without the bag of money. While the perpetrators were exiting the Diner, Mr. Fleming warned Mr. Angelico, who was still inside the restaurant, that “they” or “he” had a gun. Mr. Angelico followed the perpetrators out the front door.
Mr. Santos-Castro wore a dark hat with an insignia on the front, which he believed to be orange. He thought the insignia was an Auburn University logo. According to Mr. Fleming, State’s Exhibit #4 looked similar to the hat. Mr. Fleming viewed a portion of the Diner’s surveillance video, and when shown enlarged photographs taken from the video, he stated that although it was blurry, he believed the insignia was the same one that was on the hat in the photo.
Mr. Fleming saw Mr. Angelico write down the license plate number of the getaway vehicle in the dirt outside of the Diner, and then Mr. Angelico looked for a pen and a piece of paper to write down the number.
When Mr. Fleming was shown two photo lineups by a detective at the St. Bernard Parish Sheriffs Office, he had not seen any photographs of the defendants before. Mr. Fleming denied previously testifying that he saw photos of the defendants in a newspaper, stating that he was asked if he saw a particular photo of 18the defendants when they were brought back into the parish, and he answered that he had not seen the photo.
Mr. Fleming did not recall giving an interview about the robbery, but when defense counsel mentioned a WDSU television news report depicting an interview a day after the robbery, he admitted that he had given a statement to a WDSU reporter. Mr. Fleming confirmed that a WDSU website printout depicted the interview, and he identified a photograph of himself contained in the webpage article.

Testimony of Richard Angelico

Mr. Angelico and his friends, Mr. Fleming and the Landrys, went to the Diner for lunch in July 2009. No one was inside and no one waited on them. Mr. Fleming went to the back of the Diner and returned. Mr. Fleming went to the back of the Diner a second time and did not return. Mr. Angelico heard something that sounded like someone saying, “Give me the tape. Give me the tape. Give me the tape.” Next, he heard Mr. Fleming yelling out “Richard” in an alarmed voice, and Mr. Angelico turned around to see Mr. Fleming running from the back of the Diner holding up his zip-tied hands. One male perpetrator ran by Mr. Angelico out the front door, and another knocked Mr. Fleming down and fled. Mr. Angelico went outside and stood face-to-face with a perpetrator he identified in court, in a photo, as Mr. Rodriguez. Mr. Angelico could not do much to prevent the perpetrators’ departure, so Mr. Rodriguez turned around and entered into a gray or bluish Dodge Durango, which backed up directly in front of Mr. Angelico, and drove off. Mr. Angelico looked directly at the license plate number, TFR 014, wrote the number on the ground, and then wrote the number down on paper.

13Testimony of Deputy Sheriff Eric Banks

Deputy Sheriff Eric Banks, from Medina, Texas, was on patrol duty in August 2009, when he stopped a darker colored Dodge Durango for following another vehicle too closely. Deputy Banks checked the license plate number, TFR 014, which was listed as a possible stolen vehicle out of Houston, Texas. Mr. Santos-Castro was the passenger and Mr. Rodriguez was the driver. Mr. Santos-Castro was wearing a hat at the time, but Deputy Banks could not, with one hundred percent certainty, *940 identify State Exhibit # 4 as the same hat. Deputy Banks stated that all property on a person is confiscated when someone is taken into custody. Deputy Banks’ dash-cam video depicted Mr. Santos-Castro and Mr. Rodriguez stepping out of the vehicle, and showed Mr. Santos-Castro wearing a dark hat. Deputy Banks was unaware if Mr. Santos-Castro was involved in the theft of the vehicle.

Testimony of Detective Richard Mendel

Detective Mendel, who investigated the Diner robbery, traveled to Medina, Texas, to retrieve Mr. Santos-Castro and another individual. He received property from the Sheriffs Officer in Medina when he retrieved Mr. Santos-Castro, including a hat Mr. Santos-Castro was wearing at the time of his arrest, as well as a cell phone, and one or more earrings. Detective Mendel obtained the license plate number of the Dodge Durango from a witness. The license plate was registered in Texas. Detective Mendel stated the vehicle was stolen on July 15, 2009, but the title had been changed. Detective Mendel then confirmed that Mr. Santos-Castro had a sister living in St. Bernard Parish.
Detective Mendel reviewed surveillance video of the scene, and made a copy for further review. He stated that Mr. Santos-Castro and Mr. Rodriguez were [ 10in the video. Detective Mendel did not know the identity of the other two perpetrators. According to Detective Mendel, State Exhibit # 4 appeared to be the hat Mr. Santos-Castro was wearing when arrested, as well as the same hat in the surveillance video. Although Miss Jaber selected Mr. Santos-Castro’s photo, she was not one hundred percent certain. He did not recall showing Mr. Jaber a lineup. Mr. Fleming “definitely picked both subjects out of lineups.” Detective Mendel saw a photo of Mr. Santos-Castro and Mr. Rodriguez in a local St. Bernard Parish newspaper, but he did not see the video on the internet, on YouTube. Detective Mendel was unaware of who posted the video on the internet.
No other evidence was obtained, such as fingerprints or DNA evidence, linking Mr. Santos-Castro to the robbery. Detective Mendel assumed witnesses saw Mr. Santos-Castro and Mr. Rodriguez in court at prior hearings, when the two men would have been handcuffed, shackled, and clothed in prison jumpsuits. After Mr. Santos-Castro and Mr. Rodriguez were arrested in Texas, Detective Mendel was emailed a photograph of Mr. Santos-Castro that he used to compile a photo lineup. Police in Texas already compiled a photo lineup of Mr. Rodriguez that they emailed to Detective Mendel.
Miss Jaber informed Detective Mendel that all of the perpetrators wore baseball-type hats and blue jeans. When he showed her the photo lineup with Mr. Rodriguez’s photo, she selected Mr. Rodriguez, saying his hair appeared longer in the photograph. Detective Mendel indicated that Miss Jaber was not one hundred percent certain about her identification of either perpetrator, although he confirmed that she was “inclined” to say it was Mr. Santos-Castro. Detective Mendel reiterated that he correctly testified previously that Mr. Fleming was the only person who identified Mr. Santos-Castro. However, Mr. Jaber recalled that all of |nthe perpetrators were Hispanic. Mr. Angelico told Detective Mendel that the perpetrators were wearing blue jeans and baseball-type hats and were Hispanic. Mr. Angelico also recalled that one of the perpetrators was wearing a dark shirt.
Detective Mendel identified two baseball hats recovered from the Diner on the day of the crime, an orange Texas Longhorns hat recovered in the rear of the building, and a camouflage hat recovered in the rear *941 outside the Diner. Detective Mendel confirmed that he signed the attestation to get the warrant to bring Mr. Santos-Castro to St. Bernard Parish, which was based on detectives comparing Mr. Santos-Castro’s arrest photo to the person depicted in the surveillance video and that Mr. Santos-Castro was arrested in the vehicle bearing the license plate number written down by Mr. Angelico. Detective Mendel also relied on the hat the perpetrator was depicted wearing during the robbery. A cell phone was recovered in Mr. Santos-Castro’s possession when arrested, but he did not know about the cell phone until a defense investigator or attorney discovered the cell phone. The cell phone records were subpoenaed, but the company was unable to produce the records. Detective Mendel confirmed that Mr. Rodriguez’s DNA was found on the honeybun he partially ate and left inside the Diner.
Detective Mendel, when recalled as a witness by Mr. Santos-Castro, identified a hat in evidence as being the one Mr. Santos-Castro was wearing in the Diner. An image, introduced in evidence by the defense, depicted a hat with what appeared to be a star insignia. What Mr. Mendel described as writing on the back of the hat appeared to be the same type of writing in the video image, although he could not say it was the same writing. Detective Mendel also stated that it was possible that what was on the back of the hat was not writing, but was a buckle.

11⅞Testimony of Step hen Coleman

Stephen Coleman, a defense audio-video expert for United States Forensics, stated that his work entailed clarifying 911 recordings and surveillance recordings. Mr. Coleman converted the four-camera surveillance video recording from the Diner into DVD format, and made three still shots of a “person of interest,” focusing on the hat and a ring, as well as facial features. Mr. Coleman identified a copy of the DVD, which was played for the jury.

Testimony of Darbin Santos-Castro

Mr. Santos-Castro, through an interpreter, testified that he had one tattoo on his left arm when he was arrested. The tattoo on his right arm was from the St. Bernard Parish jail, where he was for two and a half years. Mr. Santos-Castro learned some English in jail. Mr. Santos-Castro is from Honduras and entered the United States to work in construction, “pipes,” and roofing work. When arrested, Mr. Santos-Castro worked for a piping company, Joslyn Construction, for a year and a half.
Mr. Santos-Castro testified that he was working in Houston, Texas, until 5:00 p.m. on the day of the robbery. Mr. Santos-Castro did not punch a time clock, but his employer allegedly noted his arrival and departure. After work, Mr. Santos-Castro cashed a check, sent off/wired some money, and then went to his apartment to change. Mr. Santos-Castro claimed that he | iswas not in Chalmette, Louisiana, during the weekend of the robbery.
Mr. Santos-Castro was with Mr. Rodriguez when arrested. Mr. Rodriguez was driving. Mr. Santos-Castro was allegedly unaware of the automobile’s owner, but one of Mr. Rodriguez’s brothers allegedly lent the automobile to Mr. Rodriguez. Mr. Santos-Castro was wearing two earrings when arrested, but that he was not wearing a ring. Mr. Santos-Castro did not have a firearm when arrested.
Mr. Santos-Castro did not receive a telephone call from Mr. Rodriguez the morning of the robbery. The day of the arrest, Mr. Rodriguez picked up Mr. Santos-Castro at his apartment because Mr. Rodriguez allegedly needed help moving an aunt’s belongings. Mr. Santos-Castro asserted that the hat in evidence, State *942 Exhibit # 4, was in the automobile Mr. Rodriguez was driving. Mr. Santos-Castro wore the hat to get gas when it was raining.
Mr. Santos-Castro did not know where Mr. Rodriguez’s aunt lived. However, he knew the aunt was moving from Hondo, Texas, to Houston. Mr. Santos-Castro identified Mr. Rodriguez as one person in the surveillance video, and stated that Mr. Rodriguez informed him that the other perpetrators were named Rene, a Mexican and a Honduran that lived near Mr. Santos-Castro. Mr. Santos-Castro worked to send money to his family and confessed that he was deported twice.
Mr. Santos-Castro lived with Mr. Rodriguez and Mr. Rodriguez worked once and a while. Mr. Santos-Castro never saw Mr. Rodriguez with a firearm and denied having a firearm. Mr. Santos-Castro contended that if he was on the surveillance video, he would have accepted the charges. Mr. Santos-Castro shaved his eyebrows and his moustache. When asked if he was trying to change his appearance for the jury, Mr. Santos-Castro replied that he did not need to change his appearance because he was not in the surveillance video. Mr. Santos-Castro claimed that Mr. Rodriguez committed the robbery.

Testimony of Selvin Rodriguez

Mr. Rodriguez’s attorney informed the court that his client was subpoenaed to testify, that he advised Mr. Rodriguez of his Fifth Amendment rights, and that | uMr. Rodriguez indicated through a translator that he understood his rights. Mr. Rodriguez confirmed that he participated in the armed robbery of the Diner on July 18, 2009. The day before the robbery, Mr. Rodriguez, “Rene,” “Eldon,” and “Raul” drove to Laurel, Mississippi, looking for work. When they arrived they were told there was no work in Laurel, but that there was another job in Louisiana. All four men allegedly drove back to Louisiana around 7:00 p.m.
The next day the four men drove to meet someone about the job, and they turned by the Diner. Rene said he was not going to have any problems because he (Rene) and Raul were going to use “the pistol.” Rene directed Mr. Rodriguez to enter the restaurant to see if anyone was there. Rene allegedly instructed Mr. Rodriguez to wait for a person in a blue Cherokee. Mr. Rodriguez described “Rene” as about thirty-five to thirty-six years old and a little short. Mr. Rodriguez, while wearing a camouflage hat, tried to order a hamburger and a cup of coffee, but was told by Miss Jaber that the Diner was just opening and that she did not have any hamburgers. Instead, Mr. Rodriguez ordered coffee and a honeybun. Afterward he and Rene exchanged a few cell phone calls, and Rene instructed him to ask if the Diner cashed checks. Miss Jaber informed Mr. Rodriguez that the Diner cashed checks. Mr. Jaber allegedly told Mr. Rodriguez that he would cash a check depending on the amount. The purpose of asking about check cashing was to discover if the Jabers kept money in the Diner.
As Mr. Rodriguez sat down to drink his coffee and eat his honeybun, Rene and Raul came in with guns, along with Eldon. He knew the other men were coming in with guns. Rene and Raul took out their guns at Mr. Jaber. Raul jumped over the counter after Miss Jaber. Rene called him over to help with Mr. Jaber, and they tied him up with a tie. Mr. Jaber was taken into the office, where |15Rene demanded money from a safe. Mr. Jaber resisted. Rene pulled the slide back on his 9mm pistol as a threat, whereupon Mr. Jaber became frightened and opened the safe. Mr. Jaber placed bundles of cash into a bag, and the bag was set on a table.
*943 Mr. Fleming entered into the back of the restaurant. Mr. Fleming came near the office where Rene pointed a gun at him, told him to get on the floor, that it was a robbery, and not to move. Rene handed Mr. Rodriguez a tie to bind Mr. Fleming’s hands together, but Mr. Rodriguez was shaken up, so Rene tied Mr. Fleming’s hands. Mr. Fleming stood up and ran. Mr. Rodriguez ran after Mr. Fleming and grabbed him. Rene ran out the front door, and Mr. Rodriguez followed. Both men got into an automobile. The two other perpetrators, Raul and Eldon, were walking a few blocks away. The money was left behind in the back of the Diner.
Mr. Rodriguez did not leave his camouflage hat behind. Mr. Rodriguez stated that Mr. Santos-Castro was not present in the Diner and that he informed the police that the man with him was Rene.
Mr. Rodriguez was in the United States illegally. To live here illegally meant that he lived a lie every day of his life. Mr. Rodriguez was a convicted armed robber, who previously lied to the police and to the Assistant District Attorney by initially telling them that the man in the surveillance video was his brother. A DNA test performed on the honeybun at the Diner linked him to the honeybun.
Mr. Rodriguez’s aunt lived in Carrizo Springs, about five hours from Houston, and he and Mr. Santos-Castro were helping her move when they were arrested in Texas. The automobile was the same automobile used in the robbery of 11fithe Diner. The hat in evidence, the hat allegedly worn by Mr. Santos-Castro when arrested, was in the automobile and Mr. Santos-Castro asked to borrow the hat. Mr. Rodriguez was unaware if the hat was used in the robbery.
Mr. Rodriguez had not been sentenced. He was testifying because he was guilty and Mr. Santos-Castro was innocent. Mr. Rodriguez did not expect to receive a sentencing benefit based on his testimony.

ERRORS PATENT

A review of the record reveals no errors patent on the face of the record.
However, the sentencing transcript reflects that the trial court denied Mr. Santos-Castro’s motion for new trial and immediately sentenced Mr. Santos-Castro without Mr. Santos-Castro or his counsel expressly waiving the twenty-four hour delay between the denial of a motion for new trial and sentencing, as required by La. C.Cr.P. art. 873. However, “[i]t is well-settled that a defendant may implicitly waive the twenty-four-hour delay” set by La.C.Cr.P. art. 873. State v. Green, 10-0791, p. 20 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 586.
At the sentencing hearing, Mr. Santos-Castro’s counsel announced that Mr. Santos-Castro “was ready for sentencing,” but that he had motions to file in open court before sentencing, one of which was a motion for new trial. The trial court offered to set a hearing for the motions, but defense counsel stated that the trial court could consider the motions at that time. The trial court heard argument and denied both Mr. Santos-Castro’s motion for new trial and his motion to exclude application of La. R.S. 14:64.3, the firearm sentencing provision. After the State announced that it was ready for sentencing, the trial court sentenced Mr. Rodriguez and Mr. Santos-Castro.
Mr. Santos-Castro implicitly waived La. C.Cr.P. art. 873’s twenty-four hour 117delay for sentencing. The circumstances of the instant case are similar to those in State v. Robichaux, 00-1234, p. 7 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, 464, wherein “defense counsel noted: ‘Judge, prior to the *944 sentencing, I would like to put on the record an oral motion for a new trial... This Court held that “by virtue of the defense counsel’s statement, defendant announced his readiness for sentencing, which implicitly waived the waiting period.” Id., 00-1234, p. 7, 788 So.2d at 465. In the instant case, by stating that Mr. Santos-Castro “was ready for sentencing,” but had some motions to file in open court before sentencing, one of which was a motion for new trial, defense counsel announced Mr. Santos-Castro’s readiness for sentencing. Defense counsel anticipated the denial of his motion for new trial and implicitly waived the twenty-four-hour sentencing delay of La.C.Cr.P. art. 873.

CONSTITUTIONALLY INSUFFICIENT EVIDENCE

Mr. Santos-Castro asserts that the evidence was constitutionally insufficient to support his two armed robbery convictions for two reasons: (1) the State failed to prove that either Miss Jaber or Mr. Jaber was the victim of an armed robbery and (2) the State failed to negate any reasonable probability of misidentification.
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-07, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the | ^reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Mr. Santos-Castro was charged with two counts of armed robbery with the use *945 of a firearm, violations of La. R.S. 14:64.3. La. R.S. 14:64 defines armed robbery as:
[ T]he taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
La. R.S. 14:64.3 provides that “[w]hen the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of | ^parole, probation, or suspension of sentence.”
Thus, pursuant to La. R.S. 14:64 and 14:64.3, to convict Mr. Santos-Castro of armed robbery with a firearm, the State was required to prove beyond a reasonable doubt that Mr. Santos-Castro perpetrated: “(1) the taking, (2) of anything of value, (3) from a person or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon.” State v. Robinson, 11-0066, p. 8 (La.App. 4 Cir. 12/7/11), 81 So.3d 90, 95, quoting State v. Carter, 99-2234, p. 31 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, 144.

Identity of Mr. Santos-Castro as the Perpetrator

“[W]hen the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification.” State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311, quoting State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
Mr. Fleming, a retired FBI agent, identified Mr. Santos-Castro’s photo in a pretrial photo lineup presented by Detective Mendel. Mr. Fleming testified that when he knocked on the door of the Diner’s office, two male perpetrators ran out. One perpetrator was armed -with a semiautomatic pistol, which he pointed in Mr. Fleming’s face, and ordered him onto the floor. Mr. Fleming estimated that his face was eighteen inches away from Mr. Santos-Castro’s. Mr. Fleming stated that he got a good look at the perpetrator holding a gun to his head, and he identified Mr. Santos-Castro as that person at trial. Mr. Fleming testified that he had “[n]o doubt in” his “mind” that the perpetrator was Mr. Santos-Castro.
Mr. Fleming testified that at the time of the robbery Mr. Santos-Castro was wearing a dark hat with an orange insignia on the front. Mr. Fleming stated that he 12flreported to the police officers that he thought the insignia on Mr. Santos-Castro’s hat was an Auburn University logo. When shown a hat marked as State Exhibit # 4 and asked if it looked similar to Mr. Santos-Castro’s hat, Mr. Fleming replied that it did, noting that a large “A” on the front, which was orange, could have easily been mistaken for Auburn University, which he said uses the same colors. Mr. Fleming also viewed a portion of the Diner’s surveillance video. When shown enlarged photographs taken from the surveillance video, Mr. Fleming testified that the insignia was blurry, but he believed the insignia on the hat in evidence was the same one that was on the hat in the photo.
Mr. Santos-Castro asserts that Mr. Fleming was “the person with the least opportunity to make an identification.... ” Mr. Fleming stated that he “may have” seen a photo of the defendants in the newspaper, but indicated that he meant that he may have seen an image on the television. However, Mr. Fleming denied seeing any photographs of any of the defendants before viewing the lineup.
Mr. Jaber, who was in the presence of the gunman for a longer period of time, *946 positively identified Mr. Santos-Castro at trial as the person who put a gun to his head and forced him to open the safe. Mr. Jaber stated that he got a good look at Mr. Santos-Castro. He testified that Mr. Santos-Castro called him a motherf-— and ordered him to open the safe. When Mr. Jaber experienced trouble opening the safe, Mr. Santos-Castro pushed the gun into his mouth and cursed at him again. Mr. Jaber stated that he dreamt of Mr. Santos-Castro and indicated that he could not forget Mr. Santos-Castro. At trial, Mr. Jaber identified a photograph from his video surveillance camera as depicting Mr. Santos-Castro. When asked whether he had any doubt about Mr. Santos-Castro’s identity as the perpetrator, Mr. Jaber replied: “That’s the man who destroyed my life.”
|2tMiss Jaber identified Mr. Santos-Castro in court as the person who pulled a gun on her father. She stated that Mr. Santos-Castro was heavier during the robbery than he was at trial. Miss Jaber testified that she would never forget someone who tried to kill her and her father. Miss Jaber stated that she looked at Mr. Santos-Castro for a few minutes, as he was asking the others in English what they wanted and ordering the hamburgers. Mr. Santos-Castro told her he wanted to cash a check. Miss Jaber testified that when her father came to the front of the Diner, Mr. Santos-Castro put a gun to his head and said in English, “Armed robbery. This is an armed robbery. Don’t move.”
Miss Jaber testified that she was certain that she identified the right person. Miss Jaber identified photographs taken from the surveillance video and confirmed that she saw Mr. Santos-Castro in one of the photographs, and that there was no doubt in her mind. Finally, Miss Jaber was positive that Mr. Santos-Castro was the man who accosted her father, despite Detective Mendel’s testimony that although Miss Jaber’s selection of Mr. Santos-Castro’s photo in a lineup, she was not one hundred percent certain.
The three eyewitnesses observed Mr. Santos-Castro at the time of the robbery, and the jury observed him at trial, viewed the surveillance videos, and the still photos. Further, Mr. Fleming positively identified Mr. Santos-Castro in the photo lineup from his Texas mugshot, which Detective Mendel used to compile the lineup.
Mr. Santos-Castro contends that all the identifications are unreliable when critiqued using the five factors enunciated in Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), used in determining from the totality of the circumstances whether a suggestive identification created a Insubstantial likelihood of misidentification. The five factors include: 1) the witness’s opportunity to view the criminal at the time of the crime; 2) the witness’s degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.
Mr. Santos-Castro does not explicitly aver that an identification in this case was made under suggestive circumstances or under suggestive circumstances arranged by the police. However, the Manson factors are used to assess whether identification evidence is reliable.
Thus, this Court employs the five Manson factors to assess the reliability of eyewitness identifications when reviewing the sufficiency of the evidence insofar as the State’s burden to negate any reasonable probability of misidentification when a defendant disputes identity. See State v. *947 Lewis, 11-0999, pp. 6-9 (La.App. 4 Cir. 5/23/12), 95 So.3d 533, 537-8.
Mr. Fleming, Mr. Jaber, and Miss Jaber viewed Mr. Santos-Castro during the robbery. No one gave a very good description of the gunman when interviewed by police the day of the robbery. However, Mr. Fleming stated that he remembered Mr. Santos-Castro, who put a gun to his head, and he testified that he had no doubt of his identification. Mr. Fleming also identified Mr. Santos-Castro in a pretrial photo lineup approximately two months after the robbery, and at trial, which was held approximately two and one-half years after the robbery. Both Mr. Jaber and Miss Jaber were certain of their identification of Mr. Santos-Castro at trial. Although Detective Mendel testified that Miss Jaber selected Mr. Santos-Castro’s photo in a pretrial photo lineup after Mr. Santos-Castro’s arrest, she was not one hundred percent certain the photo was of the man who put a gun in her | ^father’s face. Detective Mendel further testified that Miss Jaber was “inclined” to believe it was Mr. Santos-Castro.
Considering the Manson factors, and viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the State negated any reasonable probability of misidentifieation of Mr. Santos-Castro as the gunman who ordered hamburgers, pulled out a gun, pointed the gun in Mr. Jaber’s face, forced him to open the safe, and then put the gun in Mr. Fleming’s face. Therefore, Mr. Santos-Castro’s assertion lacks merit.

Elements of the Offenses

Insofar as the State proving the elements of the offenses beyond a reasonable doubt, Mr. Santos-Castro concedes that the State proved the element of force or intimidation as to both Miss Jaber and Mr. Jaber, citing that they were yelled at and threatened with a gun. Mr. Santos-Castro also concedes the required element that such force or intimidation was accomplished by an individual armed with a dangerous weapon, a firearm.
The two elements Mr. Santos-Castro contests are the “taking” “from the person of or in the immediate control of another.” La. R.S. 14:64.

Armed Robbery of Baker Jaber

Mr. Santos-Castro concedes that the money in the safe was in Mr. Jaber’s possession or immediate control, but asserts that there was no “taking.”
However, Mr. Jaber testified that after Mr. Santos-Castro pointed the gun in his mouth and forced him at gunpoint to open the safe inside the Diner’s office, he was told not to move. Mr. Jaber stated that the robbers took all the money and placed it into a Walmart bag from the office. Mr. Fleming testified that when Mr. | P4Santos-Castro and the other perpetrator ran out of the office when he knocked on the door, they were carrying the bag of money, which they placed on an ice bucket. Mr. Fleming testified that when he fled and the two perpetrators ran out the front door of the Diner, they forgot the money. Mr. Jaber confirmed that the money belonged to him and his daughter.
The perpetrators hastily fled from the Diner, leaving the bag of money. However, Mr. Santos-Castro, either personally or as a principal,[2] removed, money from the *948 Diner’s safe, placed the money into a bag, and put the bag down.
In State v. Neal, 275 So.2d 765 (La.1973), the defendant and two others robbed a gunshop. However, the stolen wallet was left behind. Neal, 275 So.2d at 770. The defendant was convicted of armed robbery, and the Louisiana Supreme Court rejected the defendant’s argument that there had been no proof of a taking sufficient to support his conviction for armed robbery, stating:
We are in accord with the trial court’s Per Curiam to the effect that the slightest asportation of anything of value ... the slightest deprivation for the slightest period of time ... the slightest segregation of the property moved the slightest distance is sufficient to satisfy the elements of a theft, which is part of the crime charged. A theft occurs, when the thing is taken, although it may remain in possession of the thief for only seconds. See, Comments, LSA-R.S. 14:67. See also 2 Wharton’s Criminal Law and Evidence (12th ed.) Robbery, Section 552.

Id.

Like Neal, in the instant case, there was a taking as to Mr. Jaber. Thus, there is no merit to Mr. Santos-Castro’s contention. Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found 1 gjbeyond a reasonable doubt that Mr. Santos-Castro committed the offense of armed robbery with a gun against Mr. Jaber.

Armed Robbery of Amani Jaber

Mr. Santos-Castro asserts that the State failed to prove there was a taking of anything belonging to another from Miss Jaber’s person or immediate control.
The money contained in the Diner’s office safe was the only thing taken of value. Mr. Santos-Castro avers that there was no evidence the money was on Miss Jaber’s person or in her immediate control. Mr. Santos-Castro contends that when Mr. Rodriguez asked if the Diner could cash a check, she went to ask her father, Mr. Jaber, in the back of the Diner. When the other perpetrators entered, Miss Jaber called for her father to cash a check.
Mr. Jaber testified that the money in the safe belonged to him and his daughter. “The property taken in a robbery must be sufficiently under the victim’s control that, absent violence or intimidation, the victim could have prevented the taking.” State v. Thomas, 447 So.2d 1053, 1055 (La.1984).
The video surveillance footage shows the perpetrator identified as Mr. Santos-Castro speaking to someone out of view of the camera. He then pulls a gun as Mr. Jaber comes into view of the camera and puts the gun in Mr. Jaber’s face. Miss Jaber, who is behind the service counter, hears some commotion or notices what is happening. She turns her head, then rises from a seated position, her mouth opening into either a scream or loud exclamation. At that point, another perpetrator pulls a gun on her. She ducks down and flees behind the counter toward the back of the Diner, out of view of the camera. The armed perpetrator vaults the counter and follows her. Miss Jaber was subdued by the perpetrators U^and her hands were tied. Meanwhile, Mr. Jaber was forced into the office and forced to open the safe at gunpoint.
While there was no evidence that Miss Jaber had access to the safe during the robbery, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that but for the force and intimidation employed by the perpetrators against Miss Jaber, she could have *949 prevented the perpetrators from removing the cash from the open safe.
Accordingly, viewing the entirety of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Santos-Castro robbed both Mr. Jaber and Miss Jaber at gunpoint.

NON-UNANIMOUS VERDICT

Mr. Santos-Castro contends that La. C.Cr.P. art. 782[3], permitting conviction by a non-unanimous verdict, violated his Sixth Amendment due process rights, as guaranteed by the Fourteenth Amendment. Mr. Santos-Castro does not expressly cite La. Const, art. I, § 17(A), which also provides for conviction in a non-capital felony case by a non-unanimous verdict.
The State first asserts that Mr. Santos-Castro failed to attack the constitutionality of La.C.Cr.P. art. 782 or La. Const, art. I, § 17(A) prior to appealing his convictions, citing the well-settled rule that the constitutionality of a statute cannot be attacked for the first time on appeal. “An attack upon the constitutionality of a statute must first be presented in the trial court.” State v. Williams, 08-1046, p. 2 (La.App. 4 Cir. 2/10/09), 5 So.3d 904, 905. “The ^constitutionality of a statute cannot be raised for the first time on appeal.” Id.
The record does not indicate that Mr. Santos-Castro sought to have either La.C.Cr.P. art. 782 or La. Const, art. I, 17(A) declared unconstitutional in the trial court. However, Mr. Santos-Castro does not actually attack the constitutionality of La.C.Cr.P. art. 782 or La. Const. art. I, § 17(A); rather, he avers that application of La.C.Cr.P. art. 782 to his case violated his Sixth Amendment right to due process. However, the record does not reflect that Mr. Santos-Castro objected to a non-unanimous verdict at any time, or to a jury instruction as to a non-unanimous verdict. Therefore, Mr. Santos-Castro did not preserve his right to raise this issue on appeal. See La.C.Cr.P. art. 841(A).
However, both the Louisiana Supreme Court and this Court have consistently rejected the argument Mr. Santos-Castro asserts. See State v. Bertrand, 08-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743; State v. Bonds, 11-1674, pp. 2-3 (La.App. 4 Cir. 10/3/12), 101 So.3d 531, 532.
In Bertrand, the Louisiana Supreme Court relied on a forty-year old plurality decision (with one judge concurring and four dissenting) by the U.S. Supreme Court, Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). Mr. Santos-Castro contends that “[subsequent legal developments and academic studies call the five-vote judgment in Apodaca into serious question and allow this Court to find that Art. 782 is unconstitutional and denied Darbin Santos Castro due process.”
Mr. Santos-Castro asserts that the Court’s decision in Apodaca is squarely inconsistent with the Court’s more recent, repeated pronouncements in cases reviewing criminal convictions from state courts, citing Blakely v. Washington, 542 U.S. 296, 301, 124 S.Ct. 2531, 2536, 159 L.Ed.2d 403 (2004), for the proposition l^that the *950 Sixth Amendment requires “that the ‘truth of every accusation’ against a defendant ‘should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors.’ ” (Emphasis supplied by defendant).
In Blakely, the facts admitted in the defendant’s plea supported a maximum sentence of fifty-three months. 542 U.S. at 303, 124 S.Ct. 2531. “Pursuant to state law, the court imposed an ‘exceptional’ sentence of 90 months after making a judicial determination that he had acted with ‘deliberate cruelty.’ ” Id., 542 U.S. at 298, 124 S.Ct. at 2534. The issue in Blakely was whether the imposition of the “exceptional” sentence violated petitioner’s Sixth Amendment right to trial by jury. The Court stated:
This case requires us to apply the rule we expressed in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000): “Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” This rule reflects two longstanding tenets of common-law criminal jurisprudence: that the “truth of every accusation” against a defendant “should after-wards be confirmed by the unanimous suffrage of twelve of his equals and neighbours,” 4 W. Blackstone, Commentaries on the Laws of England 343 (1769), and that “an accusation which lacks any particular fact which the law makes essential to the punishment is ... no accusation within the requirements of the common law, and it is no accusation in reason,” 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872). These principles have been acknowledged by courts and treatises since the earliest days of graduated sentencing; we compiled the relevant authorities in Apprendi, see 530 U.S., at 476-483, 489-490, n. 15 [120 S.Ct. 2348]; id., at 501-518, 120 S.Ct. 2348 (THOMAS, J., concurring), and need not repeat them here. (Emphasis added); (Footnotes omitted).
Id., 542 U.S. at 301-02, 124 S.Ct. at 2536-37. The Court reversed the defendant’s sentence, stating:
li>.a[P]etitioner was sentenced to prison for more than three years beyond what the law allowed for the crime to which he confessed, on the basis of a disputed finding that he had acted with “deliberate cruelty.” The Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to “the unanimous suffrage of twelve of his equals and neighbours,” 4 Blackstone, supra, at 343, rather than a lone employee of the State. (Emphasis added).
Id., 542 U.S. at 313-14, 124 S.Ct. at 2543.
We find Mr. Santos-Castro’s reliance on Blakely misplaced because the Court did not examine whether Louisiana’s system permitting the conviction of a defendant in state court by a non-unanimous jury for the commission of a noncapital felony violated the defendant’s Sixth Amendment due process rights, including his right to trial by jury. Accordingly, this assignment of error has no merit.

EXCESSIVE SENTENCES

Mr. Santos-Castro avers that his sentences are unconstitutionally excessive. Mr. Santos-Castro filed a motion to reconsider the sentences, which was denied by the trial court, and preserved his right to appeal the issue.
La. Const, art. I, § 20 explicitly prohibits excessive sentences. “Although *951 a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.” State v. Every, 09-0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417, quoting State v. Smith, 01-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4. “However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.” State v. Cassimere, 09-1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958, quoting State v. Landry, 03-1671, pp. 7-9 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239-40. “A sentence is | .^constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime.” State v. Ambeau, 08-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. “A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.” State v. Galindo, 06-1090, pp. 15-16 (La.App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113.
An appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1 and whether the sentence is warranted by the facts established in the record. State v. Wiltz, 08-1441, p. 10 (La.App. 4 Cir. 12/16/09) 28 So.3d 554, 561. “Once adequate compliance with Article 894.1 is found, the reviewing court must determine “whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.’ ” State v. Bell, 09-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984, quoting State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762.
However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. State v. Stukes, 08-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250, quoting State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819. Further, La. C.Cr.P. art. 881.4(D) expressly states that an “appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.”
| a,Mr. Santos-Castro was sentenced on each of his two armed robbery convictions to forty-five years at hard labor pursuant to La. R.S. 14:64, plus an additional five years at hard labor on each count, pursuant to La. R.S. 14:64.3 because the dangerous weapon used in the commission of the two armed robberies was a firearm. The additional five-year sentence on each count is required by La. R.S. 14:64.3 to run consecutively to the armed robbery counts, but each effective fifty-year sentence is to run concurrently with each other. All sentences were to be served without benefit of parole, probation, or suspension of sentence.
In sentencing Mr. Santos-Castro, the trial court issued lengthy reasons for sentencing, noting the violent circumstances of the armed robbery, that the perpetrators pointed guns at the heads of both victims, and threatened their lives. The trial court noted that the victims endured and continued to endure emotional trauma. The trial court stated that Mr. Santos-Castro had no remorse for his actions and failed to accept responsibility. The trial court also noted that the Jabers had to close the Diner after the robbery due to a loss of business that Mr. Jaber blamed on fearful customers. The trial court stated *952 that a lesser sentence would deprecate the seriousness of the crime.
La. R.S. 14:64 provides for a sentence of imprisonment at hard labor for not less than ten nor more than ninety-nine years at hard labor, without benefit of parole, probation, or suspension of sentence, while La. R.S. 14:64.3 mandates an additional sentence of five years at hard labor where the dangerous weapon used in the armed robbery was a firearm. Each of Mr. Santos-Castro’s two sentences, including the two additional five-year sentences for using the firearm, totaled fifty years. The two fifty-year sentences will run concurrently with each other.
The Louisiana Supreme Court found a sentencing range of thirty-five to fifty |32years acceptable for a first offender convicted of armed robbery. State v. Thomas, 98-1144, p. 2 (La.10/9/98), 719 So.2d 49, 50.
Considering the facts, circumstances, and factors cited by the trial court, and the record as whole, we cannot find that Mr. Santos-Castro’s sentences make no measurable contribution to acceptable goals of punishment, are nothing more than the purposeless imposition of pain and suffering, and are grossly out of proportion to the severity of the crime. Therefore, we find that the sentences are not grossly disproportionate.

DECREE

For the above-mentioned reasons, we find that sufficient evidence existed for the jury to convict Mr. Santos-Castro, that his non-unanimous verdicts were constitutional, and the sentences imposed were not excessive. Therefore, we affirm Mr. Santos-Castro’s convictions and sentences.
AFFIRMED
BONIN, J., concurs in the results.
DYSART, J., concurs in the result.

. Mr. Rodriguez was indicted separately from Mr. Santos-Castro in the instant case and is referred to in the trial transcript as Selvin Rodriguez Torres, Selvin Torres Rodriguez (apparently his correct name), Selvin Rodriguez, Selvin Torres, and Torres Rodriguez. The record contains a transcript of the sentencing of both Mr. Santos-Castro and "Sel-vin Torres Rodriguez,” who pled guilty under State v. Crosby, 338 So.2d 584 (La.1976). At the sentencing, the Assistant District attorney referred to him as "Selvin Torres Rodriguez,” while his defense counsel referred to him as "Selvin Rodriguez.” Selvin Rodriguez testified for the defense in the case sub judice.

. La. R.S. 14:24 states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

. La.C.Cr.P. art. 782 provides, in pertinent part:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.